UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
MATTHEW AVILA,                          :
                                        :      Case No.: _____
                Plaintiff,              :
                                        :
                                        :
        -against-                       :      **JURY TRIAL DEMANDED**
                                        :
                                        :
THE HABIT RESTAURANTS, INC.,            :
RUSSELL W. BENDEL, IRA FILS,            :
CHRISTOPHER K. REILLY, ALLAN W.         :
KARP, IRA ZECHER, JOSEPH J. KADOW,      :
A. WILLIAM ALLEN III, and KARIN         :
TIMPONE,                                :
                Defendants.             :
--------------------------------------- X

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, Matthew Avila, by his undersigned attorneys, for this complaint against

defendants, alleges upon personal knowledge with respect to himself, and upon information and

belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as

follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against The Habit Restaurants, Inc. ("Habit"

or the "Company")  and the members of the Company's board of directors (collectively referred

to as the "Board" or the "Individual Defendants" and, together with Habit, the "Defendants") for

their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange

Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection

with the proposed acquisition of Habit by YUM! Brands, Inc. ("Parent") and YEB Newco Inc.

("Merger Sub") (the "Proposed Transaction").

2.      On January 5, 2020, Habit entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Merger Sub will merge with and into Habit, with Habit continuing as the surviving corporation and direct, wholly-owned subsidiary of Parent (the "Merger").

3.      Upon consummation of the Merger, Habit shareholders will be entitled to receive $14.00 in cash for each share of Habit common stock they own (the "Merger Consideration").

4.      On February 4, 2020, in order to convince Habit public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Habit; (ii) the valuation analyses performed by Habit's financial advisor, Piper Sandler & Co. ("Piper Sandler"); and (iii) the confidentiality agreements Habit executed with 48 potential buyers.

6.      The Proposed Transaction is expected to be completed by the end of the second quarter of 2020, so the special meeting of Habit's shareholders to vote on the Proposed Transaction is imminent (the "Shareholder Vote").  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote, so Habit's shareholders can properly exercise their corporate voting rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below, is disclosed to Habit's

public common shareholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## <u>JURISDICTION AND VENUE</u>

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391 because Defendants are found or are inhabitants or transact business in this District. Indeed, Habit's common stock trades on the NASDAQ Global Select Market ("NasdaqGM"), which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases). Additionally, Habit's proxy solicitor, D.F. King & Co., Inc. is located in this District at 48 Wall Street, New York, NY 10005.

Last, Ropes & Gray LLP, Habit's counsel regarding the Proposed Transaction is located in this District at 1211 Avenue of the Americas, New York, NY 10036.

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Habit common stock.

12.     Defendant Habit is a public company incorporated under the laws of Delaware with principal executive offices located at 17320 Red Hill Avenue, Irvine, CA 92614.  Habit's common stock is traded on the NasdaqGM under the ticker symbol "HABT."

13.     Defendant Russell W. Bendel is, and has been at all relevant times, a director of the Company, Chairman of the Board, President, and Chief Executive Officer.

14.     Defendant Ira Fils is, and has been at all relevant times, a director of the Company.

15.     Defendant Christopher K. Reilly is, and has been at all relevant times, a director of the Company.

16.     Defendant Allan W. Karp is, and has been at all relevant times, a director of the Company.

17.     Defendant Ira Zecher is, and has been at all relevant times, a director of the Company.

18.     Defendant Joseph J. Kadow is, and has been at all relevant times, a director of the Company.

19.     Defendant A. William Allen III is, and has been at all relevant times, a director of the Company.

20.     Defendant Karin Timpone is, and has been at all relevant times, a director of the Company.

21.     The defendants identified in paragraphs 13 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Habit, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

22.     Habit is a fast, casual restaurant company.  The Company is engaged in preparing made-to-order char-grilled burgers and sandwiches featuring tri-tip steak, grilled chicken, and sushi-grade albacore tuna cooked over an open flame.  In addition, it offers sides, shakes, and malts.  The Company operates a range of restaurant formats, including end-cap, free-standing, inline, end-cap drive-thru, and traditional stand-alone drive-in, primarily within suburban shopping centers and retail settings.  Habit has 172 locations, which includes the United States and the United Arab Emirates.

23.     On January 5, 2020, the Board caused the Company to enter into the Merger Agreement with Parent and Merger Sub.  Pursuant to the terms of the Merger Agreement, Habit shareholders will receive $14.00 in cash for each share of Habit common stock they hold.

24.     According to the January 6, 2020, joint press release announcing the Proposed Transaction:

*Yum! Brands to Acquire The Habit Restaurants, Inc.*

Louisville, KY and Irvine, CA, January 6, 2020 – Yum! Brands, Inc. (NYSE: YUM) and The Habit Restaurants, Inc. (NASDAQ: HABT) ("The Habit Burger Grill") today announced that they have entered into a definitive agreement pursuant to which Yum! Brands will acquire all of the issued and outstanding common shares of The Habit Burger Grill for $14 per share in cash or a total of approximately $375 million. The board of directors of The Habit Burger Grill, acting on the recommendation of a special committee composed of non-executive independent directors, has unanimously approved the transaction.
The acquisition of The Habit Burger Grill will add an award-winning fast-casual concept with a loyal fan-base to Yum! Brands, the world's largest restaurant company in terms of units and parent of the KFC, Pizza Hut and Taco Bell global brands. Founded in California in 1969, The Habit Burger Grill offers a flavor-

forward variety of made-to-order items uniquely chargrilled over an open flame. Fan favorites include charburgers, hand-filleted and marinated chargrilled chicken sandwiches, sushi-grade chargrilled ahi tuna sandwiches, fresh salads, craveable sides and handmade frozen treats. The Habit Burger Grill, named Best Regional Fast Food in USA Today's 2019 Best Readers' Choice Awards, operates nearly 300 company-owned and franchised restaurants across the U.S. and in China.

David Gibbs, Chief Executive Officer of Yum! Brands, said, "We've emerged from our three-year transformation stronger and in a better position accelerate the growth of our existing brands and leverage our scale to unlock value from strategic acquisitions."

Gibbs continued, "As a fast-casual concept with strong unit economics, The Habit Burger Grill is a fantastic addition to the Yum! family and has significant untapped growth potential in the U.S. and internationally. With its delicious burgers and fresh proteins chargrilled over an open flame, The Habit Burger Grill offers consumers a diverse, California-style menu with premium ingredients at a QSR-like value. The transaction is a win-win because it allows us to offer an exciting new investment to our franchisees and to expand an award-winning, trend-forward brand through the power of Yum!'s unmatched scale and strengths in franchising, purchasing and brand-building."

Yum! Brands estimates minimal impact to non-GAAP earnings per share before special items in 2020, with accretion beginning in 2021 and increasing thereafter.

Russell Bendel, President and Chief Executive Officer of The Habit Burger Grill, said, "Over the past few years, we've focused on becoming a total access brand by growing our delivery business, expanding our online ordering and mobile channels and enhancing the in-store experience by introducing drive-thrus, kiosks and technology-centric solutions for operations. We're proud these and other actions have made The Habit Burger Grill an attractive candidate for a transaction of this kind. On behalf of The Habit Burger Grill Board of Directors, this transaction represents an exciting new chapter to strengthen and significantly grow The Habit Burger Grill by leveraging Yum! Brands' global scale, resources and franchising capabilities. We're confident the agreement delivers immediate value to The Habit Burger Grill shareholders and will greatly benefit our beloved brand, team members, franchisees and loyal guests for many years to come."

**The Proxy Omits Material Information**

25.     On February 4, 2020, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Shareholder Vote regarding the Proposed Transaction is imminent, as the Proposed Transaction is expected to be completed by the end of the second quarter of 2020.

The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

The Misleadingly Incomplete Financial Projections

26.     First, the Proxy omits critical financial projections, specifically Habit's unlevered free cash flow projections for 2019 through 2023 (the "Cash Flow Projections").  As stated in the Proxy, to perform its *Discounted Cash Flow Analysis* of Habit, Piper Sandler utilized projections for Habit's unlevered free cash flows, which were provided by or prepared based upon direct input from Habit's management.  Proxy at 56.  It is indisputable that the Cash Flow Projections were the most important input in Habit's *Discounted Cash Flow Analysis*—the entire analysis is based upon discounting the Cash Flow Projections to present value.  However, Defendants elected to exclude the Cash Flow Projections from the Proxy, despite the fact that they simultaneously elected to include a purported "summary" of Piper Sandler's *Discounted Cash Flow Analysis* and Habit's projections.

27.     Defendants elected to summarize Habit's projections on pages 49 to 51 of the Proxy, but they excised and failed to disclose the most important projections—the Cash Flow Projections. The omission of the Cash Flow Projections renders the projection tables on pages 49 to 51 of the Proxy misleadingly incomplete because without the Cash Flow Projections, the projection summaries provide a misleading overall valuation picture of Habit.  This is caused by significant differences between unlevered free cash flow projections—widely recognized as the most important valuation metric when it comes to valuing a company and its stock—and the

EBITDA projections that were included in the Proxy.

28.     EBITDA projection metrics *are not sufficient analogs for cash flow projections*. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected EBITDA.[1] Piper Sandler agrees, as indicated by their use of the Cash Flow Projections—not EBITDA—in performing their *Discounted Cash Flow Analysis*, and academics and practitioners concur.[2,3,4]

29.     As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[5]  Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[6]  As a result of these material differences between EBITDA and

---

[1]     Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").

[2]     "Morningstar's Approach to Equity Analysis and Security Valuation." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 305. ("We use a discounted cash flow (DCF) approach to arrive at our intrinsic value estimates because it allows us to separate economic reality from accounting-based noise.").

[3]     Copeland, Thomas. *Financial Theory and Corporate Policy*. 3rd ed. 24. ("The main difference between the accounting definition and the economic definition of profit is that the former does not focus on cash flows when they occur, whereas the latter does… Financial managers are frequently misled when they focus on the accounting definition of profit…").

[4]     Brealey, Richard, Stewart Myers, and Franklin Allen. "The Value of Common Stocks." *Principles of Corporate Finance*. 10th ed. New York: McGraw-Hill Irwin, 2011. 80. ("This discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for the present value of any other asset. We just discount the cash flows…. Notice that it is *not* correct to say that the value of a share is equal to the sum of the discounted stream of earnings per share.") (emphasis in the original).

[5]     Elizabeth     MacDonald,     *the     Ebitda     folly*,     FORBES     (March     17,     2003), http://www.forbes.com/global/2003/0317/024.html.

[6]     Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/.

unlevered free cash flows, experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

30.     In light of these significant differences between the Cash Flow Projections on the one hand, and the EBITDA figures disclosed in the Proxy, the tables of projections on pages 49 to 51 of the Proxy were materially incomplete and misleading because by failing to include the Cash Flow Projections, the tables provide a materially incomplete and misleading overall valuation picture of Habit.  Simply put, unlevered free cash flow projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

31.     Further, Defendants' failure to disclose all line items used to calculate Adjusted EBITDA and to disclose reconciliation of all non-GAAP to GAAP metrics similarly renders the Proxy materially misleading.

32.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections but have omitted the Cash Flow Projections. These omissions render the summary of projections included in the Proxy misleadingly incomplete.

The Misleadingly Incomplete Summary of Piper Sandler's Fairness Opinion

33.     The Proxy describes Piper Sandler's fairness opinion and the various valuation

analyses performed in support of their opinion.  Defendants concede the materiality of this information in citing Piper Sandler's fairness opinion and their valuation analyses among the "material" factors the Board considered in making its recommendation to Habit shareholders. Proxy at 45; *see also* Proxy at 52 ("The following is a summary of the material financial analyses performed by Piper Sandler in connection with the preparation of its fairness opinion, which was reviewed with, and formally delivered to, the Board of Directors and the Committee at meetings held on January 5, 2020."). However, the summary of Piper Sandler's fairness opinion and analyses provided in the Proxy fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Habit shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Piper Sandler's fairness opinion in determining how to vote on the Proposed Merger. This omitted information, if disclosed, would significantly alter the total mix of information available to Habit shareholders.

34.     In summarizing the *Discounted Cash Flow Analysis* prepared by Piper Sandler, the Proxy fails to disclose the following key information used in the analysis: (i) the Cash Flow Projections; (ii) the company specific WACC/CAPM inputs underlying the discount rate range of 10.9% to 15.9%; (iii) the tax benefits/payments amounts used to adjust the Company's enterprise value; (iv) the Company's non-TRA related net operating loss balance; and (v) the actual terminal values calculated.

35.     These key inputs are material to Habit shareholders, and their omission renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices

"each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness

Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount

rate, and the terminal value…" Id. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

36.     Without the above-omitted information, including the Cash Flow Projections, Habit

shareholders are misled as to the reasonableness or reliability of Piper Sandler's analyses, and

unable to properly assess the fairness of the Proposed Merger. As such, these material omissions

render the summary of the *Discounted Cash Flow Analysis* included in the Proxy misleading.

37.     Next, in summarizing Piper Sandler's *Selected Public Companies Analysis* and

*Selected Precedent Transactions Analysis*, the Proxy fails to disclose the individual multiple of

each company or transaction utilized in the analyses. A fair summary of a comparable companies

or transactions analysis requires the disclosure of the individual multiple for each company or

transaction used in the analysis. Merely providing the range of implied multiple references that a

banker calculated without any further information is insufficient, as shareholders are unable to

assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low

multiples in order to present the Merger Consideration in the most favorable light. This is

especially true here given the breadth of the ranges provide and the corresponding variation in the

implied share prices showing the implied value of the Company anywhere from 1/3 to 3x the value of the Merger Consideration. Accordingly, the omission of this material information renders the summary of these analyses provided in the Proxy misleading.

38.     Similarly, in summarizing Piper Sandler's *Premiums Paid Analysis*, the Proxy fails to disclose the identity of the transactions or the individual premiums observed. The Proxy simply states the range and median. This disclosure is insufficient and renders the summary misleadingly incomplete.

The Omission of Information Related to DADW Provisions

39.     In the section summarizing the *Background of the Merger*, the Proxy states that Habit executed confidentiality agreements, which included a standstill provision, with 48 potential buyers, but fails to disclose whether such agreements contained a "don't ask don't waive" ("DADW") provision, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect.

40.     The express communication of the existence of such provisions is material to Habit shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal.  The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed confidentiality agreements could have made a superior proposal. However, if those confidentiality agreements contained DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this material information renders the descriptions of the confidentiality agreements the Company entered into in the *Background of the Merger* section of the Proxy misleading.  Any reasonable shareholder would deem the fact that the

most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

41.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming Shareholder Vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I
### (Against All Defendants for Violations of Section 14(a) and Rule 14a-9)

42.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

43.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

44.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements

therein not false or misleading." 17 C.F.R. § 240.14a-9.

45.    The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

46.    Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; (ii) the valuation analyses performed by Piper Sandler in support of its fairness opinion; and (iii) information regarding the confidentiality agreements the Company executed.

47.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

48.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Piper Sandler reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Piper Sandler, as well as its fairness opinion and the assumptions made and

matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Piper Sandler's analyses in connection with their receipt of the fairness opinions, question Piper Sandler as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

49.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

50.     Habit is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

51.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only

through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

52.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53.     The Individual Defendants acted as controlling persons of Habit within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Habit, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

54.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

55.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

56.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

57.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

58.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

59.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 12, 2020                          **MONTEVERDE & ASSOCIATES PC**

By:   */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*